## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

LAMAR ALFONSA,

               Plaintiff,

v.

RENTOKIL   NORTH   AMERICA,   INC. *individually   and   d/b/a*,   GUARANTEE FLORIDIAN PEST CONTROL   and
JC EHRLICH CHEM CO.,

               Defendants.

Case No. _____
**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Alfonsa Lamar ("**Plaintiff**" or "**Mr. Lamar**"), by his undersigned counsel, Derek Smith Law Group, PLLC, hereby complains of Defendant Rentokil North America, Inc., *individually and d/b/a* Guarantee Floridian Pest Control ("**Defendant Rentokil**") and Defendant JC Ehrlich Chem Co., ("**Defendant Chem Co.**") (collectively, the "**Company**" or "**Defendants**"), and alleges as follows:

## INTRODUCTION

1.     This case is about a blue-collar employee trapped in a workplace infested with racial discrimination, and an employer whose willful indifference to the employee's repeated complaints culminated in a violent attack against the employee, and his unlawful termination.

2.     Plaintiff Lamar Alfonsa brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("**Title VII**") and the Florida Civil Rights Act of 1992, § 760.01, *et seq.*, Florida Statutes ("**FCRA**").  Plaintiff seeks monetary relief to redress

Defendants' willful, deliberate, and repeated employment practices in violation of Title VII and the FCRA.

3.    Defendants systematically treated Hispanic employees better than Mr. Lamar because of his race and national origin.  For instance, Mr. Lamar's immediate supervisor intentionally assigned Plaintiff inferior jobs, such that Mr. Lamar stood to earn less commission than his Hispanic coworkers.  Defendants gave Hispanic employees ice and sports drinks but gave Plaintiff water and little ice.  On Thanksgiving Day, Defendants sent Mr. Lamar and his black coworkers to a job in Orlando, Florida.  Meanwhile, Defendants never sent any Hispanic employees to jobs hundreds of miles away.  Worse, Plaintiff's coworkers would say things like, "You're lazy," or when Mr. Lamar would arrive proudly bearing Haitian regalia, his Hispanic coworkers would hold their noses and say, "Haitians fucking stink."

4.    Defendants enforced its internal policy against Mr. Lamar but failed to discipline Hispanic employees.  For example, Defendants disciplined Plaintiff for "cursing in front of a lady," but took no action against an employee who repeatedly smoked in Company vehicles and had a cursing fit, and banged the walls of his supervisor's office.  Then, a Hispanic who grew tired of Mr. Lamar's discrimination complaints attacked Mr. Lamar with a machete.  Mr. Lamar reported the incident to the police, and five days later Defendants terminated Plaintiff for "unprofessional behavior."

5.    Mr. Lamar made every effort to complain, apprise, and plead with Defendants to rectify a workplace laden with unbelievable racial disparity and hostility.  Mr. Lamar complained to his immediate supervisor.  He complained to Defendants' branch manager.  He complained to the Company hotline.  He complained to Rentokil executives.  Not only did Defendants fail to

rectify the racial disparity in its workplace—Defendants made it clear they had no interest in entertaining Plaintiff's complaints.

6.      For instance, after he attempted to complain to Defendants' branch manager, the manager told Mr. Lamar, "You complain too much."  Other times the manager locked the office door.  One time, the manager stuck his middle finger up at Mr. Lamar for so long Plaintiff had time to take a picture.  To be sure, Defendants did not operate an equal opportunity workplace— Defendants were preoccupied with corporate mergers and avoiding violations to rectify the most racist, hostile work environment Mr. Lamar had ever experienced.

7.      At bottom, this Action seeks to redress Defendants' deprivation of Plaintiff's personal dignity and his civil right to pursue an equal employment opportunity in a work environment free from intentional discrimination, retaliation, and wrongful termination.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question) and 42 U.S.C. §2000e-5(f)(3) (Title VII), and 28 U.S.C. § 1367 (supplemental jurisdiction).

9.      Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b) because a substantial portion of the actions or omissions giving rise to this Action occurred in the Southern District of Florida.

## PARTIES

10.     Plaintiff Alfonsa Lamar is an individual residing in Miami-Dade County, Florida.

11.     Plaintiff is expressly authorized to bring this action by sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3) and FCRA § 760.11(1).

12.     Defendant Guarantee Floridian Pest Control Corporation is a Florida Profit Corporation.

13.     Defendant Guarantee Floridian is a "person" within the meaning of 42 U.S.C. §2000e(a) and FCRA § 760.02(6) and an "employer" within the meaning of 42 U.S.C. §2000e(b) and FCRA § 760.02(7).

14.     Defendant Rentokil North America, Inc. is a Foreign Profit Corporation, with its principal address located at 1125 Berkshire Blvd., Suite 150, Wyomissing, Pennsylvania 19160, and locations throughout the United States, including a location at 658 NW 99th St, Miami, Florida 33150.

15.     Defendant Rentokil is a publicly traded corporation with operations throughout throughout the United States.

16.     Defendant Rentokil is a "person" within the meaning of 42 U.S.C. §2000e(a) and FCRA § 760.02(6) and an "employer" within the meaning of 42 U.S.C. §2000e(b) and FCRA § 760.02(7).

17.     On or about October 16, 2015, Defendant J.C, Ehrlich Co., Inc. began doing business as "Rentokil North America, Inc."

18.     On or about March 23, 2020 Defendant Rentokil merged with JC Ehrlich Chem Co. *individually and d/b/a* Guarantee Floridian Pest Control.

19.     Plaintiff was jointly employed by Defendant Rentokil and Defendant Guarantee Floridan Pest Control at all material times.

## ADMINISTRATIVE PREREQUISITES

20.     Plaintiff has complied with all administrative requirements.

21.     On or about April 4, 2017, Plaintiff timely dual-filed a charge of discrimination (Charge No. 846-2017-10324) with the U.S. Equal Employment Opportunity Commission ("**EEOC**"), and the Florida Commission on Human Relations ("**FCHR**"), naming JC Ehrlich Chem Co. d/b/a Guarantee Floridian Pest Control as the Respondent.

22.     The EEOC investigated Plaintiff's charge and found reasonable cause to believe Defendants subjected Plaintiff to unlawful discrimination in violation of Title VII.

23.     On or about March 19, 2021, after unsuccessfully attempting to conciliate, the EEOC issued Mr. Lamar's right to sue notice.

24.     This Complaint was timely commenced within 90 days of the EEOC's notice of Plaintiff's suit rights.

## FACTUAL ALLEGATIONS

25.     Plaintiff Alfonsa Lamar is 48-year-old black man of Haitian descent.

26.     On or about April 12, 2015, Mr. Lamar began working for Defendants as a "Pest Control Technician."  Mr. Lamar worked on a crew of three employees who would travel to customers' homes to fumigate pests from residential homes.

27.     Mr. Lamar began working for Defendants at a time in his life when he was ready to turn over a new leaf.  Indeed, Mr. Lamar had recently been released from incarceration and was determined to be a productive contributor.  In fact, Plaintiff had spent time studying and working as a law clerk while in prison.

28.     Unfortunately, Mr. Lamar's job with Defendants exposed him to the most discriminatory, hostile environment he had ever experienced.

29.     Favio Herrera ("**Mr. Herrera**") was the "District Manager" for Defendants at Guarantee Floridan Pest Control's Miami location.  Mr. Herrera was Plaintiff's immediate

supervisor and held direct supervisory authority over Mr. Lamar, controlling various terms and conditions of his employment.

30.    Mr. Herrera treated Hispanic and/or Colombian employees more favorably than Mr. Lamar because of his race.  Indeed, Mr. Herrera provided non-black, non-Haitian employees with more favorable job assignments, resulting in Plaintiff's diminished opportunities to earn commission.  Mr. Herrera enforced the Company's policy against Plaintiff but did not discipline Hispanic and/or Colombian employees.  After a Hispanic employee attacked Mr. Lamar with a machete, Mr. Herrera placed Mr. Lamar under investigation, and terminated him five days later.

31.    Bob Freeman ("**Mr. Freeman**") was the "Assistant Branch Manager" of Defendants' location in Miami, Florida.  Mr. Freeman hired Mr. Lamar and held direct supervisory authority over Plaintiff, controlling various terms and conditions of his employment.

32.    Mr. Freeman made every effort to refuse to investigate Mr. Lamar's repeated discrimination complaints.  Indeed, Mr. Freeman told Plaintiff he "complained too much," locked the door when Mr. Lamar attempted to complain, and stuck his middle finger up at Mr. Lamar merely because he sought to complain about discrimination.  Mr. Freeman sent an employee who had fallen off a roof the day before to drive Mr. Lamar to a job site even though the employee—who was ranting and raving in Mr. Freeman's office—was in no condition to drive.  Mr. Freeman's philosophy was to let the employees deal with their issues on their own.

33.    Deborah Turney ("**Ms. Turney**"), based in Charlotte, North Carolina, was the "HR Business Partner – Southeast Market" for Rentokil North America. Ms. Turney held direct supervisory authority, including the power to terminate Plaintiff, controlling various terms and conditions of his employment.  Ms. Turney claimed to do something about Mr. Lamar's various complaints through the Company hotline, but in the end, Ms. Turney was just like everyone else

at the Company—she did not care about Mr. Lamar's plight.  In fact, Ms. Turney enforced Mr. Lamar's termination for "unprofessional behavior" after Mr. Lamar reported the machete attack to the police.

### Defendants Intentionally Treat Plaintiff Less Favorably than Hispanic and/or Colombian Employees because of Plaintiff's Race and National Origin

34.     Defendants treated Mr. Lamar less favorably than its Hispanic, non-Hatian employees because of his black race and Haitian national origin.

35.     Mr. Lamar's co-workers insisted on harassing Plaintiff because of his Haitian ethnicity.  For example, Mr. Lamar has a Haitian flag on his personal vehicle, and he takes pride in his Haitian background.  Nonetheless, throughout the course of Plaintiff's employment, his co-workers would make unwanted and offensive comments about Mr. Lamar's Haitian ethnicity.  For instance, when Plaintiff's Hispanic workers finished a job at a Haitian customer's house, the co-workers would come out of the house squeezing their noses, saying things like "Damn, Haitians fucking stink."

36.     Defendants provided Hispanic and/or Colombian employees greater job benefits than Mr. Lamar.  Mr. Herrera—who oversaw daily assignments—routinely assigned Plaintiff and his black co-workers to the smaller properties, while he assigned Colombian and Hispanic workers to the larger, more lucrative properties.  Consequently, Plaintiff stood to earn far less commission than his non-black, non-Haitian coworkers because Defendants paid commission based on the square footage of a customer's home.

37.     Defendants provided updated equipment to Hispanic employees, yet Defendant would deny Mr. Lamar's requests to repair broken down equipment.  For example, when Mr. Lamar asked for a wheel barrel to be replaced, Mr. Herrera told Plaintiff "too bad—deal with it." Yet, Mr. Herrera would routinely provide new equipment to Hispanic employees.  Similarly, Mr.

Herrera never allowed Mr. Lamar to use the Company truck, while he had no issues providing ones to Hispanic employees. For example, Mr. Herrera loaned Giovanni Romero ("**Mr. Romero**") a truck, but when Plaintiff's truck broke down, Mr. Herrera told Mr. Lamar he could not help him.

38.     Defendants provided Hispanic employees ice and sports drinks while Mr. Lamar and his crew would get water and little ice.

39.     Defendants enforced their internal policy against Mr. Lamar, yet Hispanic employees would go unpunished. Indeed, on or about October 31, 2016, during a Company meeting, Mr. Lamar used the word "shit" to describe unsafe work conditions. Consequently, Defendants reprimanded Plaintiff twice—both verbally (for "cursing in front of a lady") and in writing (for "talking loudly and using profanity"). Defendants defied its own policy by reprimanding Mr. Lamar twice for the same alleged infraction.

40.     Moreover, even though this was Mr. Lamar's only write up, Defendants stated Mr. Lamar had been "coached in the past about his outbursts and unprofessional behavior including yelling and use of profanity. Any future incidence of this behavior will result in immediate termination."

41.     While Defendants reprimanded Mr. Lamar twice for saying "shit," to describe unsafe working conditions, Defendants failed to reprimand Hispanic employees for repeated violations. For example, Mr. Lamar repeatedly complained about Javier Recuero ("**Mr. Recuero**") for smoking in Company vehicles. However, Defendants never disciplined Mr. Recuero. Similarly, Defendants failed to discipline Mr. Recuero for arriving to work with holes in his shirt.

42.     Hispanic employees would leave for job sites without Mr. Lamar, yet Hispanic employees would wait extended periods for other Hispanic and/or Colombian employees. Worse,

whenever Mr. Lamar happened to arrive a few moments late, his Hispanic co-workers—included the ones who routinely arrived up to thirty minutes late—would call Plaintiff lazy, and say he had no work ethic.

43.     On or about Thanksgiving Day of 2016, Defendants assigned Mr. Lamar to a job in Orlando—hundreds of miles away.  Defendants did not send any of its Hispanic employees to Orlando on Thanksgiving Day—or any day at all.

**<u>Defendants' Willful Indifference to Plaintiff's Repeated Discrimination Complaints</u>**

44.     Defendants defied their own policy by refusing to address Plaintiff's repeated complaints of discrimination.   Not only did Defendants fail to investigate Mr. Lamar's complaints—they terminated *because* he complained.

45.     Yet, the Company imposed a duty on employees to "warn [their] manager or supervisor of any suspicious workplace activity, or incidents that appear problematic that [the employee] observe[s], or [is] aware of, involving other employees … [w]e will not condone any form of retaliation against an employee making a report under this policy."

46.     So, after experiencing disparate treatment because of his race and national origin, Mr. Lamar referred to the Company handbook, and brought the hostility and inequity to Defendants' attention.

47.     However, Defendants actions did not comport with their own policy.   Indeed, Defendants did not even make an effort to listen to Plaintiff's discrimination complaints, let alone investigate them.   Mr. Lamar complained to Mr. Freeman about disparate treatment in the workplace because of Plaintiff's race and national origin.   Specifically, Mr. Lamar complained about Mr. Herrera's favorable treatment to Hispanic employees.   Further, Mr. Lamar complained Defendants' failure to discipline Hispanic employees when violating company policy.

48.     Mr. Lamar complained that Defendants enforced the Company's policy against him but bever disciplined Hispanic employees for their violations.   For example, Defendants maintained a policy of "No smoking or other use of tobacco products in vehicles owned, leased, or rented by the Company."   Mr. Lamar complained to Mr. Freeman and Mr. Herrera that Mr. Recuero repeatedly violated the policy while in the car with Mr. Lamar, which aggravated the symptoms of Plaintiff's health condition.   However, neither Mr. Herrera nor Mr. Freeman ever disciplined Mr. Recuero or even told him to stop.   Conversely, Mr. Herrera reprimanded Plaintiff both verbally and in writing and placed Mr. Lamar on a final warning after Plaintiff said "shit" while describing unsafe working conditions.

49.     Mr. Freeman, on behalf of the Company, repeatedly demonstrated he wanted nothing to do with Mr. Lamar's complaints.   For example, when Mr. Lamar approached Mr. Freeman to complain about racial discrimination, Mr. Freeman told Mr. Lamar, "You complain too much."   On other occasions—after Mr. Lamar complained again because of the Company's failure to rectify disparate treatment—Mr. Freeman would lock his office door when he saw Mr. Lamar approaching.   On yet another occasion, Mr. Freeman stuck his middle finger up at Mr. Lamar for so long that Plaintiff had time to take a photo of Mr. Freeman's willful indifference to Plaintiff's plight.

50.     So, Mr. Lamar complained to Mr. Herrera, Mr. Gary, Ms. Turney, and the Company Hotline.   Mr. Lamar notified Defendants' corporate representatives of disparate treatment in the workplace because of his race.   For example, Mr. Lamar repeatedly contacted the company Hotline.   However, Ms. Turney never took Plaintiff's complaints seriously, evinced by the lack of action by Defendants nor Mr. Freeman or Mr. Herrera.

51.     As a result of the Company's inaction, Plaintiff was subjected to greater racial discrimination, resulting in violent attack against Plaintiff.  When Mr. Lamar reported the incident to the police, as explained below, Defendants terminated Mr. Lamar's employment.

**Defendants Terminate Plaintiff After He Complains about Discrimination**

52.     On or about January 5, 2017, Mr. Recuero attacked Mr. Lamar with a machete.

53.     Earlier that day, Lazaro Core ("**Mr. Core**"), one of Defendants' fumigator technicians, was having a tantrum in the office.  Mr. Core had fallen off a roof at a jobsite the day before.  Meanwhile, Mr. Lamar was watching Mr. Core cursing and punching the walls in the office while arguing with Mr. Freeman.  Plaintiff realized Mr. Core was in no condition to be working that day.  Nonetheless, Mr. Freeman assigned Mr. Core to drive Mr. Lamar to a job site that day.

54.     At around 9 A.M., Mr. Lamar, Mr. Recuero and Gerineldo Hernandez ("**Mr. Hernandez**"), arrived at a customer's house to do a routine fumigation.

55.     Mr. Lamar got frustrated that Mr. Recuero—once again—was smoking in the Company vehicle.  Mr. Lamar, who was standing outside of the vehicle, recorded Mr. Recuero smoking to show Defendants.

56.     Mr. Recuero became furious.  He said, "Why are you videotaping me?"  He got out of the vehicle, grabbed a machete, said, "stop taking videos of me, I'm sick of it!"  and then chased Mr. Lamar with a machete.

57.     The only reason Mr. Recuero did not slash Plaintiff with the machete was because Mr. Saul Gamez ("**Mr. Gamez**") and Mr. Curtis Lynch ("**Mr. Lynch**") stopped Mr. Recuero from attacking Plaintiff.  They shouted at Mr. Recuero, saying, "No bro!  Stop!"  Luckily, Plaintiff evaded Mr. Recuero's would-be fatal attack just in time.

58.     Moments later, Mr. Lamar reported the incident to the police.  Broward County police officers arrived, investigated the incident, and arrested Mr. Recuero.

59.     Meanwhile, Mr. Herrera had arrived.  He drove Mr. Lamar back to the Company's office.

60.     In the car, Mr. Herrera looked at Plaintiff and said, "What the fuck are you calling the police for?"  Mr. Lamar was shocked.  Here he was, after being attacked by his co-worker—as a culminating event of Defendants' inaction—and now Mr. Herrera was reprimanding him calling the police.  Mr. Herrera showed zero concern for the fact that Mr. Lamar's life had just flashed before his eyes.  Mr. Herrera said, "You're under investigation—immediately!"

61.     On or about January 11, 2017, Defendants terminated Mr. Lamar "due to unprofessional behavior."

62.     The above are just some of the examples of unlawful race discrimination and retaliation Defendants subjected Plaintiff to on a repeated and ongoing basis.

63.     Defendants unlawfully discriminated against Plaintiff because of his race and national origin and because he complained and opposed race discrimination and retaliation.

64.     Defendants unlawfully terminated Plaintiff because of his race and national origin and because he complained of race and national origin discrimination.

65.     Plaintiff has suffered emotional distress, mental anguish, loss of personal dignity, and other intangible damages.  For example, Mr. Lamar and his wife had lost the enjoyment of their lives.  Mr. Lamar would mope around their home, unwilling to leave.  At night he would twist and turn amid nightmares that he was being attacked with a machete.  During the days, Mr. Lamar experienced bouts of anger and frustration.  To this day, four years later, Mr. Lamar still wakes up in the night, terrified someone is chasing him with a machete.

66.     Defendants' wrongful termination of Mr. Lamar created extreme financial strife in Plaintiff's life.  Indeed, Mr. Lamar was forced to apply for food assistance.

67.     As a result of Defendants' unlawful conduct, Plaintiff has suffered damages, including but not limited to financial and economic damages, lost wages (back pay and front pay) and benefits, advancement opportunities with Defendant, and continues to suffer the same.

68.     Plaintiff claims a continuous practice of discrimination and claims that Defendants subjected him to continuing violations and makes all claims herein under the continuing violations doctrine.

69.     Plaintiff claims aggravation, activation, and/or exacerbation of any preexisting conditions.

70.     Plaintiff seeks punitive damages against Defendants because the Company willfully and repeatedly violated Plaintiff's rights by depriving him of his civil rights motivated by evil intent.

71.     At bottom, Defendant is liable for depriving Plaintiff of his personal dignity and his civil right to pursue an equal employment opportunity in a work environment free from unrelenting discrimination, harassment, retaliation and wrongful termination.

**CAUSES OF ACTION**

**COUNT I**
**Title VII, 42 U.S.C. § 2000e-2(a)**
**Disparate Treatment**
**(Against all Defendants)**

72.     Plaintiff reincorporates the allegations contained in paragraphs 34-51.

73.     Defendants violated Title VII, 42 U.S.C. § 2000e-2(a) by intentionally treating Plaintiff less favorably than Hispanic employees because of his race and national origin.

74.     Defendants gave Hispanic and/or Colombian employees more lucrative job assignments than Plaintiff.  For example, Mr. Herrera, acting as an agent of Defendants, routinely assigned Plaintiff and his black co-workers the smaller houses while he assigned Hispanic and/or Colombian employees to the bigger houses, intentionally depriving Plaintiff of financial opportunities because of his race.  Plaintiff had less opportunity to make commission than his Hispanic co-workers because Defendants paid its employees commission per square footage of a customer's home.  Thus, Defendants provided Plaintiff with less opportunities to earn as much money as his non-black, non-Haitian coworkers.

75.     On Thanksgiving Day of 2016, Defendants assigned Plaintiff to a job in Orlando, Florida—a round trip of nearly 500 miles in one day.  Conversely, Defendants did not assign any Hispanic and/or Colombian employees a job in Orlando on Thanksgiving Day.

76.     Moreover, Defendants provided Hispanic and/or Colombian employees better equipment than Plaintiff.  For example, when Plaintiff asked Mr. Herrera to replace or repair Plaintiff's broken-down wheel barrel, Mr. Herrera told him to deal with it.  Conversely, when Mr. Romero, a Hispanic, Colombian employee asked for new equipment, Mr. Herrera (also a Hispanic, Colombian employee) provided the request to Mr. Romero.  On another occasion, when Plaintiff's assigned truck was broken down, Mr. Herrera took no action.  Yet, when Mr. Romero's truck was broken down, Mr. Herrera lent Mr. Romero his truck.

77.     Defendants provided Hispanic employees ice and sports drinks, but supplied Plaintiff with water and little ice.  If Plaintiff happened to be running less than five minutes behind, Defendants would routinely leave for a job site.  Yet, if Hispanic employees were late—sometimes upwards of 30 minutes—Defendants would have no problem waiting.

78.     Defendants enforced their internal policies against Plaintiff, yet failed to enforce Company policy against their Hispanic and/or Colombian employees.  For example, Defendants reprimanded Plaintiff for "cursing in front of a lady," both verbally and in writing, yet Defendants failed to reprimand Mr. Recuero for repeatedly smoking in Company vehicles or coming to work with holes in his clothing.  Similarly, Defendants did not discipline Mr. Core when he screamed, cursed and banged the walls in Mr. Freeman's office.

79.     Taken together, these examples of disparate treatment give rise to the reasonable inference that Defendants intentionally treated Plaintiff less favorably than Hispanic and/or Colombian employees because of Plaintiff's black race and Haitian national origin.

80.     As a result of Defendants unlawful employment actions in violation of Title VII, 42 U.S.C. § 2000e-2(a), Plaintiff has suffered damages.

**COUNT II**
**FCRA, § 760.10(1)(a)**
**Disparate Treatment**
**(Against all Defendants)**

81.     Plaintiff reincorporates the allegations contained in paragraphs 34-51.

82.     Defendants violated FCRA, § 760.10(1)(a) by intentionally treating Plaintiff less favorably than Hispanic employees because of his race and national origin.

83.     Defendants gave Hispanic and/or Colombian employees more lucrative job assignments than Plaintiff.  For example, Mr. Herrera, acting as an agent of Defendants, routinely assigned Plaintiff and his black co-workers the smaller houses while he assigned Hispanic and/or Colombian employees to the bigger houses, intentionally depriving Plaintiff of financial opportunities because of his race.  Plaintiff had less opportunity to make commission than his Hispanic co-workers because Defendants paid its employees commission per square footage of a

customer's home.  Thus, Defendants provided Plaintiff with less opportunities to earn as much money as his non-black, non-Haitian coworkers.

84.     On Thanksgiving Day of 2016, Defendants assigned Plaintiff to a job in Orlando, Florida—a round trip of nearly 500 miles in one day.  Conversely, Defendants did not assign any Hispanic and/or Colombian employees a job in Orlando on Thanksgiving Day.

85.     Moreover, Defendants provided Hispanic and/or Colombian employees better equipment than Plaintiff.  For example, when Plaintiff asked Mr. Herrera to replace or repair Plaintiff's broken-down wheel barrel, Mr. Herrera told him to deal with it.  Conversely, when Mr. Romero, a Hispanic, Colombian employee asked for new equipment, Mr. Herrera (also a Hispanic, Colombian employee) provided the request to Mr. Romero.   On another occasion, when Plaintiff's assigned truck was broken down, Mr. Herrera took no action.  Yet, when Mr. Romero's truck was broken down, Mr. Herrera lent Mr. Romero his truck.

86.     Defendants provided Hispanic employees ice and sports drinks, but supplied Plaintiff with water and little ice.  If Plaintiff happened to be running less than five minutes behind, Defendants would routinely leave for a job site.  Yet, if Hispanic employees were late—sometimes upwards of 30 minutes—Defendants would have no problem waiting.

87.     Defendants enforced their internal policies against Plaintiff, yet failed to enforce Company policy against their Hispanic and/or Colombian employees.  For example, Defendants reprimanded Plaintiff for "cursing in front of a lady," both verbally and in writing, yet Defendants failed to reprimand Mr. Recuero for repeatedly smoking in Company vehicles or coming to work with holes in his clothing.  Similarly, Defendants did not discipline Mr. Core when he screamed, cursed and banged the walls in Mr. Freeman's office.

88.     Taken together, these examples of disparate treatment give rise to the reasonable inference that Defendants intentionally treated Plaintiff less favorably than Hispanic and/or Colombian employees because of Plaintiff's black race and Haitian national origin.

89.     As a result of Defendants unlawful employment actions in violation of FCRA, § 760.10(1)(a), Plaintiff has suffered damages.

**COUNT III**
**Title VII, 42 U.S.C. § 2000e-2(a)**
**Hostile Work Environment**
**(Against all Defendants)**

90.     Plaintiff reincorporates the allegations in paragraphs 25-61.

91.     Defendants subjected Plaintiff to harassment because of his race, and national origin in violation of Title VII, 42 U.S.C. § 2000e-2(a).

92.     Plaintiff's co-workers insisted on discriminating against Plaintiff because of his Haitian national origin.   For example, when Plaintiff would arrive at Defendants' building his co-workers would hold their noses, implying that Plaintiff smelled bad because of the Haitian flag he flew on his car. On other occasions whenever Plaintiff's co-workers finished a job for a Haitian family, they would say things like, "Damn—Haitians fucking stink."

93.     Plaintiff was subjected to unwelcome harassment because of his protected class status throughout his employment with Defendants.  Mr. Freeman would harass Plaintiff by sticking his middle finger up at Mr. Lamar when he attempted to complain about disparate treatment in the workplace.  Other times, Mr. Freeman would lock the door.  Moreover, Plaintiff was attacked with a machete because of his race.  Mr. Herrera assigned Plaintiff smaller houses, while supplying Hispanic employees with larger hours, directly affecting Plaintiff's living.  Similarly, Mr. Herrera provided Hispanic employees with ice and sports drinks, while Plaintiff got water and little ice.

94.     Mr. Freeman further discriminated against Plaintiff by sending Mr. Core to drive Plaintiff to the job knowing that Mr. Core was in no condition to work that day.  Indeed, Mr. Freeman knew that Mr. Core had fallen of the roof the day before.  Mr. Freeman also knew that Mr. Core had embarked on a tirade banging doors and screaming.  Still, Mr. Freeman intentionally assigned Mr. Core to drive Plaintiff to the job site knowing of his fitness.  Immediately upon arrival, Mr. Recuero attacked Plaintiff with a machete.

95.     The above-described harassment was sufficiently severe and/or pervasive to alter the terms and conditions of Plaintiff's employment.  Indeed, the inability to make complaints because of his race altered the conditions of Defendants' own handbook which instructed employees to complain.  Further, the adverse job assignments cost Plaintiff financial strife each time Mr. Herrera assigned Hispanic and/or Colombian employees to larger properties than Plaintiff.  Consequently, Plaintiff earned less money than his non-black, non-Haitian coworkers because of Plaintiff's race and national origin.  Moreover, Plaintiff was attacked with a machete, and subsequently investigated and ultimately terminated after he called the police.

96.     Defendants are liable for the environment because Plaintiff exhausted every avenue to bring such discrimination to its attention.  For example, Plaintiff complained to Mr. Freeman, Mr. Herrera, and Ms. Turney.  Still, nothing changed.  Mr. Freeman would ignore Plaintiff's complaints, going so far as to lock the door when Plaintiff attempted to complain of racial discrimination.  On another occasion, Mr. Freeman stuck his middle finger up at Plaintiff for so long that Plaintiff obtained a picture of Mr. Freeman's blatant insult.

97.     Plaintiff exhausted every channel provided by Defendants.  Defendant neglected their guidelines for appropriately responding to a race-related harassment claim, causing Plaintiff to experience extreme racial discrimination.  Plaintiff complained to his immediate supervisor, Mr.

Freeman.  Plaintiff complained to corporate executives.  Plaintiff complained through Defendant's harassment hotline.   Thus, Defendants had actual notice of Plaintiff's racial discrimination complaints.

98.     Still, Defendants failed to exercise reasonable care.  In fact, Defendants failed to take any care.  Mr. Freeman would either tell Plaintiff he "complained too much," give him the middle finger or otherwise lock his door.

99.     This point is buttressed by the culminating fact that Plaintiff was physically attacked by a co-worker wielding a machete, set to kill Plaintiff, after months of repeated complaints to Defendants, giving Defendants every opportunity to correct the harassing behavior.  Instead, Defendants took no action.

100.    As a result of Defendants unlawful employment actions in violation of Title VII, 42 U.S.C. § 2000e-2(a) Plaintiff suffered damages.

### COUNT IV
### FCRA, § 760.10(1)(a)
### Hostile Work Environment
### (Against all Defendants)

101.    Plaintiff reincorporates the allegations in paragraphs 25-61.

102.    Defendants subjected Plaintiff to harassment because of his race, and national origin in violation of Title VII, 42 U.S.C. § 2000e-2(a).

103.    Plaintiff's co-workers insisted on discriminating against Plaintiff because of his Haitian national origin.   For example, when Plaintiff would arrive at Defendants' building his co-workers would hold their noses, implying that Plaintiff smelled bad because of the Haitian flag he flew on his car. On other occasions whenever Plaintiff's co-workers finished a job for a Haitian family, they would say things like, "Damn—Haitians fucking stink."

104.    Plaintiff was subjected to unwelcome harassment because of his protected class status throughout his employment with Defendants.  Mr. Freeman would harass Plaintiff by sticking his middle finger up at Mr. Lamar when he attempted to complain about disparate treatment in the workplace.  Other times, Mr. Freeman would lock the door.  Moreover, Plaintiff was attacked with a machete because of his race.  Mr. Herrera assigned Plaintiff smaller houses, while supplying Hispanic employees with larger hours, directly affecting Plaintiff's living.  Similarly, Mr. Herrera provided Hispanic employees with ice and sports drinks, while Plaintiff got water and little ice.

105.    Mr. Freeman further discriminated against Plaintiff by sending Mr. Core to drive Plaintiff to the job knowing that Mr. Core was in no condition to work that day.  Indeed, Mr. Freeman knew that Mr. Core had fallen of the roof the day before.  Mr. Freeman also knew that Mr. Core had embarked on a tirade banging doors and screaming.  Still, Mr. Freeman intentionally assigned Mr. Core to drive Plaintiff to the job site knowing of his fitness.  Immediately upon arrival, Mr. Recuero attacked Plaintiff with a machete.

106.    The above-described harassment was sufficiently severe and/or pervasive to alter the terms and conditions of Plaintiff's employment.  Indeed, the inability to make complaints because of his race altered the conditions of Defendants' own handbook which instructed employees to complain.  Further, the adverse job assignments cost Plaintiff financial strife each time Mr. Herrera assigned Hispanic and/or Colombian employees to larger properties than Plaintiff.  Consequently, Plaintiff earned less money than his non-black, non-Haitian coworkers because of Plaintiff's race and national origin.  Moreover, Plaintiff was attacked with a machete, and subsequently investigated and ultimately terminated after he called the police.

107.    Defendants are liable for the environment because Plaintiff exhausted every avenue to bring such discrimination to its attention.  For example, Plaintiff complained to Mr. Freeman, Mr. Herrera, and Ms. Turney.  Still, nothing changed.  Mr. Freeman would ignore Plaintiff's complaints, going so far as to lock the door when Plaintiff attempted to complain of racial discrimination.  On another occasion, Mr. Freeman stuck his middle finger up at Plaintiff for so long that Plaintiff obtained a picture of Mr. Freeman's blatant insult.

108.    Plaintiff exhausted every channel provided by Defendants.  Defendant neglected their guidelines for appropriately responding to a race-related harassment claim, causing Plaintiff to experience extreme racial discrimination.  Plaintiff complained to his immediate supervisor, Mr. Freeman.  Plaintiff complained to corporate executives.  Plaintiff complained through Defendant's harassment hotline.   Thus, Defendants had actual notice of Plaintiff's racial discrimination complaints.

109.    Still, Defendants failed to exercise reasonable care.  In fact, Defendants failed to take any care.  Mr. Freeman would either tell Plaintiff he "complained too much," give him the middle finger or otherwise lock his door.

110.    This point is buttressed by the culminating fact that Plaintiff was physically attacked by a co-worker wielding a machete, set to kill Plaintiff, after months of repeated complaints to Defendants, giving Defendants every opportunity to correct the harassing behavior. Instead, Defendants took no action.

111.    As a result of Defendants unlawful employment actions in violation of FCRA § 760.10(1)(a), Plaintiff has suffered damages.

**COUNT V**
**Title VII, 42 U.S.C. § 2000e-3(a)**
**Retaliation**
**(Against all Defendants)**

112.    Plaintiff reincorporates the allegations in paragraphs 34-61.

113.    Plaintiff engaged in protected activity, among other ways, by complaining to Mr. Freeman, the Company hotline, Mr. Herrera, and to the police of racial and national origin discrimination.

114.    Shortly after Plaintiff filed his complaints, Defendants initiated a series of retaliatory events that would dissuade a reasonable person from complaining about discrimination.

115.    For example, Mr. Freeman would tell Plaintiff he "complained too much."  Other times, following Plaintiff's discrimination complaints, Mr. Freeman would lock his door when he saw Plaintiff approaching.  On one occasion, Plaintiff attempted to complain about discrimination, Mr. Freeman stuck his middle finger up at Plaintiff for so long that Plaintiff had time to take a picture of Mr. Freeman's disgusting response.

116.     After Mr. Lamar complained to Mr. Herrera about unfair work assignments, Mr. Herrera continued assigning Plaintiff to smaller houses than Hispanic employees.  Then, on Thanksgiving Day of 2016, Defendants assigned Plaintiff to a job in Orlando, Florida. Moreover, Defendants placed Plaintiff on a final warning for "cursing in front of a lady" when Mr. Lamar complained of unsafe working conditions and otherwise disparate treatment.

117.    Then, on or about January 5, 2017, after Plaintiff complained again about racial discrimination, Mr. Freeman allowed Mr. Core to drive Plaintiff to the job site.  Mr. Core had fallen of a roof the day before.  On the morning of January 5, 2017, Mr. Core was screaming in Mr. Freeman's office uncontrollably, banging on the walls, and in no condition to work.

Nonetheless, Mr. Freeman sent Mr. Core to take Plaintiff to the site.  When they arrived, Mr. Recuero attacked Plaintiff with a machete.

118.    Shortly thereafter, Plaintiff engaged in protected activity by calling the police.

119.    Mr. Herrera was aware that Plaintiff called the police. Indeed, Mr. Herrera drove Plaintiff back to Defendants' office and said, "What the fuck are you calling the police for?"  Mr. Herrera immediately suspended Plaintiff and placed him under investigation.  Then, on or about January 11, 2021, Mr. Herrera, acting for Defendants, terminated Plaintiff for "unprofessional behavior."

120.    Any reasonable worker in Plaintiff's position would be dissuaded from complaining about discrimination if he knew his employer would subject Plaintiff to *more*, not less discrimination, and certainly not if he knew complaining would result in termination.

121.    Defendant took the aforementioned adverse actions against Plaintiff because of the various protected activities described above.

122.    As a result of Defendant unlawful retaliation in violation of Title VII, § 2000e-3(a), Plaintiff has suffered damages.

**COUNT VI**
**FCRA, § 760.10(7)**
**Retaliation**
**(Against all Defendants)**

123.    Plaintiff reincorporates the allegations in paragraphs 34-61.

124.    Plaintiff engaged in protected activity, among other ways, by complaining to Mr. Freeman, the Company hotline, Mr. Herrera, and to the police of racial and national origin discrimination.

125.    Shortly after Plaintiff filed his complaints, Defendants initiated a series of retaliatory events that would dissuade a reasonable person from complaining about discrimination.

126. For example, Mr. Freeman would tell Plaintiff he "complained too much." Other times, following Plaintiff's discrimination complaints, Mr. Freeman would lock his door when he saw Plaintiff approaching. On one occasion, Plaintiff attempted to complain about discrimination, Mr. Freeman stuck his middle finger up at Plaintiff for so long that Plaintiff had time to take a picture of Mr. Freeman's disgusting response.

127. After Mr. Lamar complained to Mr. Herrera about unfair work assignments, Mr. Herrera continued assigning Plaintiff to smaller houses than Hispanic employees. Then, on Thanksgiving Day of 2016, Defendants assigned Plaintiff to a job in Orlando, Florida. Moreover, Defendants placed Plaintiff on a final warning for "cursing in front of a lady" when Mr. Lamar complained of unsafe working conditions and otherwise disparate treatment.

128. Then, on or about January 5, 2017, after Plaintiff complained again about racial discrimination, Mr. Freeman allowed Mr. Core to drive Plaintiff to the job site. Mr. Core had fallen of a roof the day before. On the morning of January 5, 2017, Mr. Core was screaming in Mr. Freeman's office uncontrollably, banging on the walls, and in no condition to work. Nonetheless, Mr. Freeman sent Mr. Core to take Plaintiff to the site. When they arrived, Mr. Mr. Recuero attacked Plaintiff with a machete.

129. Shortly thereafter, Plaintiff engaged in protected activity by calling the police.

130. Mr. Herrera was aware that Plaintiff called the police. Indeed, Mr. Herrera drove Plaintiff back to Defendants' office and said, "What the fuck are you calling the police for?" Mr. Herrera immediately suspended Plaintiff and placed him under investigation. Then, on or about January 11, 2021, Mr. Herrera, acting for Defendants, terminated Plaintiff for "unprofessional behavior."

131.    Any reasonable worker in Plaintiff's position would be dissuaded from complaining about discrimination if he knew his employer would subject Plaintiff to *more*, not less discrimination, and certainly not if he knew complaining would result in termination.

132.    Defendants took the aforementioned adverse actions against Plaintiff because of the various protected activities described above.

133.    As a result of Defendants unlawful retaliation in violation of FCRA, § 760.10(7), Plaintiff has suffered damages.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Plaintiff demands judgment against Defendants, containing the following relief:

A.      An order directing Defendant Renotkil and Defendant Guarantee Floridian to place Plaintiff in the position he would have had but for Defendants' discriminatory, retaliatory and/or otherwise unlawful treatment of Plaintiff.

B.      An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

C.      Pursuant to FCRA § 760.11(5) and Title VII § 102(b)(3), an award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, personal dignity, depression and other nonpecuniary losses;

D.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

E.      Pursuant to FCRA §760.11(5) and Title VII § 102(b)(1), an award of punitive damages against Defendants for the Company's engagement in discriminatory practices with malice or with reckless indifference to Plaintiff's rights under federal and state law

F.      An award against Defendants of liquidated damages;

G.      Pursuant to FCRA § 760.11(5) and Title VII § 103, an award against Defendants of costs that Plaintiff has incurred in this Action, as well as Plaintiff's reasonable attorneys' fees plus costs and interest to the fullest extent permitted by law; and

H.      Such other and further relief the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff Alfonsa Lamar hereby demands a jury trial of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991.

Dated: June 16, 2021

Respectfully submitted,

By: <u>/s/ Caroline H. Miller</u>
Caroline H. Miller, Esq.
Fl Bar No. 1012331
**DEREK SMITH LAW GROUP, PLLC**
*Attorneys for Plaintiff Alfonsa Lamar*
701 Brickell Ave., Suite 1310
Miami, Florida 33131
(305) 946-1884
Primary: caroline@dereksmithlaw.com